**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Irfan M Mirza, et al., | No. CV-20-08148-PCT-DJH |
| Plaintiffs, | **ORDER** |
| v. | |
| Bullhead City Hospital Corporation, et al., | |
| Defendants. | |

Pending before the Court are four Motions to Dismiss Plaintiffs' First Amended Complaint ("FAC") (Docs. 47; 50; 51; 52). Plaintiffs have filed Responses to each Motion (Docs. 60; 61; 62; 63), and the corresponding Defendants have filed their Replies (Docs. 64; 65; 66; 67). The Motions are fully briefed.[1] For the following reasons, the Court will grant Defendants' Motions (Docs. 50; 51; 52), except for Defendant Bullhead City Hospital Corporation dba Western Arizona Regional Medical Center's ("WARMC") Motion (Doc. 47), which the Court will grant in part and deny in part.

/ / /

---

[1] One of the Motions requested oral argument on this matter (Doc. 51). The request is denied. The matter is fully briefed, and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b) (stating that a court may decide motions without oral hearings); LRCiv 7.2(f) (same).

Defendant Bullhead City Hospital Corporation dba Western Arizona Regional Medical Center also filed a Motion to Seal Documents (Doc. 48) to support its Motion to Dismiss (Doc. 47). Plaintiffs have not filed any response in opposition. However, the Motion to Seal (Doc. 48) will be denied as moot because the documents are not necessary for the Court to make its decision.

**I.     Background**

The following background comes from the FAC's factual allegations, which the Court must assume are true at this motion to dismiss phase. *See Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001).

The FAC alleges that over the years Plaintiffs Dr. Irfan Mirza and his business, Vista Health, had "built a successful and thriving" cardiology practice in and around Bullhead City, Arizona. (Doc. 41 at ¶¶ 2, 10–11). Part of Dr. Mirza's practice entailed Privileges to work as a medical staff member at WARMC (the FAC capitalizes "Privileges" when referring to those that relate to WARMC). (*Id.* at ¶ 10). Dr. Mirza also heled privileges at another nearby hospital, Valley View Medical Center ("VVMC"), which is not a party to this action. (*Id.* at ¶ 61).

According to the FAC, Dr. Mirza's practice was doing so well that WARMC's Chief Executive Officer, had offered to purchase the practice in May 2018. (*Id.* at ¶ 70). Around the same time, Defendants, consisting of WARMC and several doctors who make up members of WARMC committees and its Board of Trustees, allegedly experienced "a sharp decline in the number of patients they were seeing," so they "launched a relentless campaign of manufacturing vague, unsupported anonymous complaints and accus[ed] Dr. Mirza of being incompetent and of having bipolar disorder, to not only destroy his reputation in the community, but to oust him from the [Bullhead City] area." (*Id.* at ¶ 3).

In the midst of this "campaign" Dr. Mirza had several challenges with the hospitals at which he worked. He "asserted that the care provided by certain medical staff members at WARMC and VVMC posed a severe and unacceptable risk to patient safety." (*Id.* at ¶ 67). In addition to these whistleblower claims, Dr. Mirza shared call coverage at VVMC with a former "resentful" colleague, Defendant Dr. Mohamed Ahmed, whom Dr. Mirza had previously reported to state and federal authorities for inappropriately prescribing medications. (*Id.* at ¶¶ 55, 63).

While the FAC makes clear that Dr. Mirza had issues with VVMC, it also alludes to issues VVMC had with Dr. Mirza. For example, on November 14, 2018, Dr. Mirza and

VVMC "resolved their issues through a confidential settlement agreement." (*Id.* at ¶ 76). The FAC implies that Dr. Mirza's privileges at VVMC were modified. (*See id.* at ¶¶ 77, 81–82) ("A limitation on or revocation of Privileges has been equated to a restriction on a physician's license to practice medicine, as his or her ability to practice medicine is materially limited as a result."). In addition, after his agreement with VVMC, in October 2018, Dr. Mirza voluntarily underwent a behavioral health assessment by a psychiatrist "to refute certain behavioral allegations made by VVMC." (*Id.* at ¶ 79). The resulting report found "'no DSM-5 psychiatrist diagnoses . . . . No evidence of substance abuse [and] No concern for clinician impairment, disruptive behavior, or burnout.'" (*Id.* at ¶ 80).

After learning of the issues at VVMC, WARMC's Chief of Staff, Defendant Dr. Waheed Zehri, requested that the hospital's Medical Executive Committee ("MEC") conduct a peer review of Dr. Mirza. (*Id.* at ¶ 77). Dr. Zehri had "asserted that information was received that Dr. Mirza had been summarily suspended at VVMC, and [he] falsely claimed that Dr. Mirza had 'engaged in inappropriate conduct that undermines a culture of safety, and has issues identified regarding documentation, supervision of personnel, and other clinical concerns.'" (*Id.* at ¶ 77).

On November 2, 2018, "the MEC summarily suspended Dr. Mirza's interventional cardiology privileges allegedly due to the care of a patient on September 8, 2018 plus 'other [unspecified] clinical, compliance, and behavioral related concerns.'" (*Id.* at ¶ 86) (this quote's edits are as written in the FAC). Four days later, the MEC suspended all of Dr. Mirza's Privileges "allegedly based upon his care of this aforementioned patient and the revocation of his [p]rivileges at VVMC." (*Id.* at ¶ 87). The FAC alleges that, to the contrary, Dr. Mirza's VVMC privileges were never fully revoked. (*Id.* at ¶ 88). Furthermore, the FAC alleges "the MEC's allegations were just a pretense in furtherance of the plan to remove Dr. Mirza from the [Bullhead City] area." (*Id.* at ¶ 89). Dr. Mirza was also concerned that "WARMC's peer review process was in retaliation for the patient safety issues he had raised." (*Id.* at ¶ 78).

Like VVMC, WARMC also presented Dr. Mirza with a confidential agreement

("WARMC Agreement"), which Dr. Mirza signed on November 27, 2018, less than two weeks after Dr. Mirza signed the other agreement with VVMC. (*Id.* at ¶¶ 76, 115). The WARMC Agreement allowed Dr. Mirza to resume work at WARMC. (*Id.* at ¶ 95).

In June 2019, WARMC sent Dr. Mirza a Notice of Investigation, a process of peer review, regarding three of his patients' cases. (*Id.* at ¶ 135). One of the MEC members, Defendant Dr. Ihtisham Choudhry, claimed that Dr. Mirza suffered from bipolar disorder, which prompted a "Wellness Committee" to investigate the MEC's "wellness related concerns." (*Id.* ¶¶ 140–41). After meeting with Dr. Mirza, the Wellness Committee "identified concerns regarding [Dr. Mirza's] mental health and wellbeing." (*Id.* at ¶ 150). The Wellness Committee claimed that Dr. Mirza potentially had bipolar disorder, even though none of those on the Committee had degrees in psychology or psychiatry. (*Id.* at ¶¶ 143, 152). The Committee recommend Dr. Mirza take a one-year leave of absence "to undergo psychiatric care." (*Id.* at ¶ 4). Dr. Mirza refused this recommendation. (*Id.* at ¶ 173).

In July 2019, the MEC met and suspended Dr. Mirza's medical staff membership and clinical Privileges for the second time. (*Id.* at ¶ 165). In August 2019, the MEC fully revoked Dr. Mirza's Privileges "based upon alleged violations of the WARMC Agreement and his care of what had suddenly become five patients, as well as his refusal to follow the Wellness Committee's [leave of absence] recommendation." (*Id.* at ¶ 173). The FAC alleges that the MEC took this action because of Dr. Mirza's perceived mental illness. (*Id.* at ¶ 169). The FAC also alleges the MEC's actions were taken "with the goal of eliminating a key competitor in order to monopolize the interventional cardiology market . . . ." (*Id.* at ¶ 180).

After the MEC's peer review, a "Fair Hearing Committee" recommended that WARMC reinstate Dr. Mirza, but the MEC rejected this recommendation. (*Id.* at ¶ 192). Dr. Mirza also appealed to the WARMC Board of Trustees, which affirmed the MEC's decision. (*Id.* at ¶¶ 193–94). The Board "formally unanimously revoked Dr. Mirza's Privileges on February 10, 2020." (*Id.* at ¶ 197).

Plaintiffs bring fourteen claims against Defendants, WARMC, the MEC and its members, as well as the members of WARMC's Board of Trustees. (*Id.* at ¶¶ 201–347). They are as follows:

1. Violation of § 504 of the Rehabilitation Act of 1973 against WARMC. (*Id.* at ¶¶ 201–17).
2. Fraudulent inducement to execute the WARMC Agreement against WARMC and Dr. Richard Cardone. (*Id.* at ¶¶ 218–27).
3. Fraudulent inducement for Dr. Mirza to return to WARMC against WARMC, Dr. Richard Cardone, Dr. Ihtisham Choudhry, and Dr. Malik Rahim. (*Id.* at ¶¶ 228–37).
4. Tortious interference with prospective economic advantage against WARMC. (*Id.* at ¶¶ 238–47).
5. Civil conspiracy to tortiously interfere with prospective economic advantage against the MEC and each MEC member in their individual capacity. (*Id.* at ¶¶ 248–59).
6. Civil conspiracy to tortiously interfere with prospective economic advantage against each member of the WARMC Board of Trustees in their individual capacity. (*Id.* at ¶¶ 260–71).
7. Civil conspiracy to tortiously interfere with prospective economic advantage against Dr. Richard Cardone, Dr. Ihtisham Choudhry, and Dr. Howard Morris. (*Id.* at ¶¶ 272–84).
8. Civil Conspiracy to tortiously interfere with prospective economic advantage against Dr. Malik Rahim, Dr. Waheed Zehri, and Dr. Ihtisham Choudhry. (*Id.* at ¶¶ 285–97).
9. Breach of contract regarding WARMC's Medical Staff Bylaws against WARMC, each member of the WARMC Board of Trustees in their individual capacity, the MEC, and each MEC member in their individual capacity. (*Id.* at ¶¶ 298–306).

10. Breach of the implied covenant of good faith and fair dealing regarding WARMC's Medical Staff Bylaws against WARMC, each member of the WARMC Board of Trustees in their individual capacity, the MEC, and each MEC member in their individual capacity. (*Id.* at ¶¶ 307–14).
11. Breach of Contract Regarding the WARMC Agreement against WARMC, each member of the Board of Trustees in their individual capacity, the MEC, and each MEC member in their individual capacity. (*Id.* at ¶¶ 315–22).
12. Breach of the Implied Covenant of Good Faith and Fair Dealing Regarding the WARMC Agreement against WARMC, each member of the Board of Trustees in their individual capacity, the MEC, and each MEC member in their individual capacity. (*Id.* at ¶¶ 323–30).
13. This claim requests injunctive relief in the form of reinstating Dr. Mirza's privileges and "requiring WARMC to withdraw and/or void the adverse action report(s) regarding the suspension and revocation of Dr. Mirza Privileges previously filed with National Practitioners Data Bank." (*Id.* at ¶¶ 331–37).
14. Violation of the Arizona Civil Rights Act against WARMC. (*Id.* at ¶¶ 338–47).

In addition to the claim for injunctive relief, Dr. Mirza seeks an award of exemplary and punitive damages. (*Id.* at 42).

## II.  Legal Standard

Complaints must make a short and plain statement showing that the pleader is entitled to relief for its claims. Fed. R. Civ. P. 8(a)(2). There must be factual allegations from which a court may reasonably infer that a defendant has acted unlawfully. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Simply presenting "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," does not suffice to state a claim. *Id.*

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a claim. *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011). Dismissal of a complaint for failure to state a claim can be based on either the "lack of a cognizable legal theory or the absence

of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

In reviewing a motion to dismiss, "all factual allegations set forth in the complaint 'are taken as true and construed in the light most favorable to the plaintiffs.'" *Lee*, 250 F.3d at 679 (quoting *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996)). But courts are not required "to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

### III. Analysis

To begin, Plaintiffs agreed to dismiss their Arizona Civil Rights Act claim, (Doc. 60 at 17), after WARMC noted that Plaintiffs have not filed a charge against WARMC with Arizona's Civil Rights Division. (Doc. 47 at 18). With that claim dismissed, the Court will evaluate the § 504 Rehabilitation Act claim and then turn to the several tort and contract claims.

### a. *§ 504 of Rehabilitation Act of 1973*

The Rehabilitation Act of 1973 aims to "promote and expand employment opportunities in the public and private sectors for handicapped individuals and place such individuals in employment." 29 U.S.C. § 701(8). An individual may bring a claim under § 504 of the Act by showing: "(1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001); *see also* 29 U.S.C. § 794(a). WARMC argues the FAC fails to show the second and third elements. (Doc. 47 at 4–6).

#### i. *Otherwise Qualified*

WARMC argues that the FAC admits Dr. Mirza's Privileges were revoked because of "his poor patient care, failure to provide continuous care, and falsification of medical records," showing that Dr. Mirza was not otherwise qualified to remain on staff. (*Id.* at 6).

But the FAC alleges other facts from which the Court can infer that those reasons offered by WARMC were a pretext. For example, the FAC alleges that Dr. Mirza performed well as a doctor and that his Privileges were revoked because of a perceived mental illness and for fear that Dr. Mirza's practice would be too competitive. (*See* Doc. 41 at ¶¶ 1, 66, 167–70, 180). WARMC also implies in its briefing that it revoked Dr. Mirza's Privileges because he actually had bipolar disorder. (Doc. 47 at 6) ("[B]ipolar disorder has long been recognized as a condition that can pose a direct threat to the health and safety of patients."). But the alleged psychiatric reports allow the Court to infer that he did not suffer from bipolar disorder. (*See* Doc. 41 at ¶¶ 80, 177). Overall, the FAC presents sufficient allegations to show Dr. Mirza was otherwise qualified for his position. *See Iqbal*, 556 U.S. at 678 (noting that courts must look for sufficient facts in a complaint by which they may infer culpable conduct at the motion to dismiss phase).

          *ii.*      *Solely by Reason of Disability*

WARMC argues that the FAC shows Dr. Mirza's perceived disability was not the sole reason his privileges were revoked. (Doc. 47 at 4). For support, WARMC points to allegations in the FAC discussing how Defendants complained of patient care issues and Dr. Mirza's non-compliance with the WARMC Agreement. (*Id.*) (citing Doc. 41 at ¶ 173). Again, the Court may infer that these stated reasons were just a pretext for revoking Dr. Mirza's Privileges because of a perceived disability. (*See* Doc. 41 at ¶ 180). That being said, allegations of pretext do not defeat the core of WARMC's argument because the FAC clearly alleges Defendants acted "*with the goal of eliminating a key competitor* in order to monopolize the interventional cardiology market . . . ." (*Id.*) (emphasis added). The FAC plainly alleges that "Defendants collaborated, conspired, and engaged in a concerted effort to ruin Dr. Mirza's reputation and thriving medical practice and drive him from the Western Arizona cardiology and internal medicine market." (*Id.* at ¶ 1). Given the allegations that Defendants were motivated by business reasons, it seems the FAC shows Defendants had mixed motives, or that the mental health issues raised by Defendants were also a pretext.

          There is limited caselaw supporting the proposition that when a complaint shows a

defendant had mixed motives, a court may dismiss § 504 claims for failing to show the defendant was solely motivated by reason of disability. *See Ward v. Kaiser Found. Hosp.*, 2006 WL 2529479, at *4 (N.D. Cal. Aug. 31, 2006) (suggesting that dismissing a § 504 claim may be appropriate when a complaint demonstrates mixed motives); *Lewin v. Med. Coll. of Hampton Rds.*, 910 F. Supp. 1161, 1172 (E.D. Va. 1996), *aff'd*, 131 F.3d 135 (4th Cir. 1997) (dismissing a § 504 claim after a plaintiff admitted that defendants had mixed motives). However, the Court is not convinced that it may dismiss the § 504 claim in this instance.

To be clear, Plaintiffs make contradictory arguments. They argue in their briefing that Defendants' "true motive[]" for firing Dr. Mirza was his perceived disability. (Doc. 60 at 7). There are sufficient allegations in the FAC to support this position. (*See* Doc. 41 at ¶¶ 167–70, 201–217). And yet the FAC argues with equal fervor that Defendants were motivated by business reasons to remove Dr. Mirza from their area of practice. (*Id.* at ¶¶ 1–4, 180). But a contradictory position is not necessarily fatal to a complaint.

Federal Rule of Civil Procedure 8(d) allows a party to make inconsistent statements of fact in its pleadings. *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 918 n.10 (9th Cir. 2012); *Molsbergen v. United States*, 757 F.2d 1016, 1018–19 (9th Cir. 1985); Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc.*, § 1283 (3rd ed., Supp. 2011). If any one of a party's alternative pleadings is sufficient, then they all are. Fed. R. Civ. P. 8(d)(2). In addition, at this stage, the Court is required to view allegations in the light most favorable to Plaintiffs. *See Lee*, 250 F.3d at 679. Given these pleading standards, the Court finds that Plaintiffs have alleged sufficient facts to infer that Defendants revoked Dr. Mirza's Privileges solely by reason of a perceived disability, or, in the alternative, because they saw him as a business threat. Therefore, at this juncture, the Court will not dismiss Plaintiffs' § 504 claim.

  b. *Immunity Relating to Review of Medical Practices*

The Court will now proceed to address the FAC's tort and contract claims for damages resulting from the peer review process. Defendants, WARMC and the individuals

who participated in the peer review process, collectively argue that Arizona statute bars the FAC's Second through Thirteenth claims. (Docs. 47 at 8; 50 at 2; 51 at 6; 52 at 4).

Arizona statute governs the medical peer review process. *See* A.R.S. § 36-445 *et seq.* Within the statutory requirements for review are certain legal protections for hospitals and those involved with the review process.

> A. Any individual who, in connection with duties or functions of a hospital . . . makes a decision or recommendation as a member . . . employee of the medical or administrative staff of a hospital . . . is not subject to liability for civil damages or legal action in consequence thereof.
>
> B. No hospital . . . and no individual involved in carrying out review or disciplinary duties or functions of a hospital . . . may be liable in damages to any person who is denied the privilege to practice in a hospital . . . . The only legal action which may be maintained by a licensed health care provider based on the performance or nonperformance of such duties and functions is an action for injunctive relief seeking to correct an erroneous decision or procedure.

A.R.S. § 36-445.02.

Plaintiffs present three arguments why their claims are not barred by A.R.S. § 36-445.02. They argue that Defendants waived their statutory protections, that the statutory protection is irrelevant because the claims arise from conduct outside of the peer review process, and that the Arizona Constitution's anti-abrogation clause permits their torts claims. (Doc. 60 at 9–14).

> *i.     Waiver*

First, Plaintiffs argue that WARMC's bylaws waive immunity in cases of malice, bad faith, or fraud. (*Id.* at 9–10). Under Arizona law, some statutory immunities may be waived when a party clearly intends to do so. *In re Estate of King*, 269 P.3d 1189, 1194 (Ariz. Ct. App. 2012). Plaintiffs point to sections of WARMC's bylaws that waive general liability in instances of malice. (*Id.*) (citing Doc. 47-1 at 32, 76).[2] But none of these

---

[2] "I extend immunity to, and release from any and all liability, the Hospital, its authorized representatives and any third parties, as defined in subsection (3) below, for any acts, communications, recommendations or disclosures performed without intentional fraud or malice involving me . . . ." (Doc. 47-1 at 32).

"No representative of the hospital . . . shall be liable to a practitioner . . . for damages or other relief by reason of providing information . . . provided such disclosure or representation is in good faith and without malice. (Doc. 47-1 at 76).

provisions appear to specifically address the peer review process. To the contrary, the bylaws state that "[a]ll members of the Board, the Medical Staff and hospital personnel assisting in Medical Staff peer review shall have immunity from any civil liability to the fullest extent permitted by state and federal law . . . ." (*Id.* at 56). The fullest extent would include A.R.S. § 36-445.02. Therefore, because it is not clear to the Court that the bylaws intended to waive those protections, they do not.

### ii. *Outside the Peer Review Process*

Plaintiffs argue that their claims are based on conduct outside of the peer review process, such that A.R.S. § 36-445.02 does not apply. (Doc. 60 at 12). Specifically, they argue that the FAC's fraud claims involve conduct that occurred "before peer review immunity would have attached." (Doc. 60 at 13). Plaintiffs also claim that anything related to the "Wellness Committee and its activities is not part of the peer review process." (Doc. 60 at 13).

Plaintiffs cite *Humana Hospital Desert Valley v. Superior Court of Arizona*, 742 P.2d 1382, 1386 (Ariz. Ct. App. 1987), and *Mishler v. Clift*, 191 F.3d 998, 1007 (9th Cir. 1999), for the proposition that, as they say, "[i]f a cause of action is derived by conduct that was not part of the peer review process, then no immunity attaches." (Doc. 60 at 13). The Court notes that *Humana* dealt with the issue of whether information outside a peer review process was admissible, which is not at issue here. 742 P.2d at 1386. Likewise, *Mishler* dealt with the scope of immunity for the *Nevada* Board of Medical Examiners and it is not relevant, either. 191 F.3d at 1007. Of importance is the fact that the main injury in the FAC's fraud claims was caused by the revocation of Dr. Mirza's Privileges. (Doc. 41 at ¶¶ 224, 234). In fact, all the injuries Plaintiffs claim are plainly the "consequence" of the peer review process. *See* A.R.S. § 36-445.02(A). And it may be that the Wellness

---

"The representatives of the hospital, including its Board, CEO, administrative employees and Medical Staff shall not be liable to a practitioner or AHP for damages or other relief for any action taken or statement of recommendation made within the scope of such representative's duties, if such representative acts in good faith and without malice after a reasonable effort to ascertain the facts and in a reasonable belief that the action, statement or recommendation is warranted by such facts." (*Id.*)

- 11 -

Committee acted outside of this process by finding that Dr. Mirza potentially had bipolar disorder and recommending a leave of absence, but the FAC fails to show what culpable conduct that Committee engaged in, as it was the MEC that began the process of revoking Dr. Mirza's Privileges. (*See* Doc. 41 at ¶ 153). Overall, the FAC's tort and contract claims plainly relate to the consequences of the peer review process. Therefore, those claims fall within the scope of A.R.S. § 36-445.02.

> i. *Anti-Abrogation Clause*

Finally, Plaintiffs argue the Arizona Constitution's anti-abrogation clause renders A.R.S. § 36-445.02 invalid, thereby permitting Plaintiffs' claims. (Doc. 60 at 11). Plaintiffs do not say so explicitly, but if the Court were to accept Plaintiffs' argument, it would necessarily find that an Arizona statute was invalid under Arizona's Constitution. Generally, Arizona courts presume a statute's constitutionally, and a party challenging a statute must convince the court beyond a reasonable doubt before the court may declare the statute unconstitutional. *Hall v. A.N.R. Freight Sys., Inc.*, 717 P.2d 434, 437 (Ariz. 1986).

The anti-abrogation clause states that "[t]he right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation . . . ." Ariz. Const. art. XVIII, § 6. "This provision serves the purpose of protecting the fundamental right to recover money damages pursuant to recognized common law tort causes of action." *Goodman v. Samaritan Health Sys.*, 990 P.2d 1061, 1065 (Ariz. Ct. App. 1999). Plaintiffs argue A.R.S. § 36-445.02 violates the anti-abrogation clause because the statute abrogates their right to recover damages from Defendants' activities. (Doc. 60 at 11).

This is not the first challenge to A.R.S. § 36-445.02 under the anti-abrogation clause. In *Samaritan Health Sys. v. Superior Court of State of Arizona*, the Arizona Court of Appeals held that A.R.S. § 36-445.02 barred a party's breach of contract claims against a hospital because "application of the anti-abrogation clause does not extend to common law contract claims." 981 P.2d 584, 594 (Ariz. Ct. App. 1998). Plaintiffs concede this

point. (Doc. 60 at 12). Therefore, the Court finds that claims Nine through Twelve in the FAC are barred by A.R.S. § 36-445.02.

Plaintiffs maintain that the FAC's remaining tort claims, which are for fraud, tortious interference with prospective economic advantage, and civil conspiracy to tortiously interfere with prospective economic advantage, are still permissible because of the anti-abrogation clause. (*Id.*)

On this issue, the analysis in *Goodman v. Samaritan Health System* is instructive. 990 P.2d 1061. There, a physician sued a hospital alleging negligent peer review and malicious prosecution after being denied staff privileges. *Id.* at 1064. The physician, like Dr. Mirza, argued that the anti-abrogation clause allowed his tort claims, despite A.R.S. § 36-445.02. *Id.* at 1065. The court began its analysis by noting the anti-abrogation clause "operates to preclude the legislature from abolishing a common law right of action for money damages that either existed as of statehood or judicially evolved into existence thereafter." *Id.* (citing *Hazine v. Montgomery Elevator Co.*, 861 P.2d 625, 628–29 (Ariz. 1993)). The court then reviewed the history of medical peer review. *Id.*

In Arizona, statutorily mandated peer review did not exist until 1971. *Id.* at 1066. Before then, local medical societies had their own private process of review, and a physician could only seek an injunction to be reinstated if the physician claimed to be wrongly expelled from the society. *Id.* at 1067 (citing *Blende v. Maricopa Cnty. Med. Soc'y*, 393 P.2d 926, 929–30 (Ariz. 1964)). Courts of that period hesitated to become more involved than was necessary in the private affairs of medical societies. *Id.* Once this process was formalized in statute, the legislature amended the law in 1984 "to remove any liability for any legal consequence, including money damages, for any individual or hospital involved in peer review activities, except for injunctive relief for an erroneous decision or procedure occurring during the process." *Id.* at 1066. After recounting this history, the *Goodman* court found that, "in connection with malicious or negligent peer review as alleged by Goodman, we conclude that prior to 1971, no common law right of action for damages existed in Arizona." *Id.* at 1067.

Plaintiffs argue that *Goodman's* ruling is narrow, that the court only decided the specific torts of negligent peer review and malicious prosecution were barred by A.R.S. § 36-445.02. (Doc. 60 at 12). Therefore, Plaintiffs argue, *Goodman* poses no obstacle to their different tort claims for fraud, tortious interference with prospective economic advantage, and civil conspiracy to tortiously interfere with prospective economic advantage. (*Id.*) This Court is not persuaded.

The *Goodman* court did note that if the physician had brought a defamation claim against an individual peer reviewer, the analysis might have been different. 990 P.2d at 1068 n.9. But there are no such defamation claims brought against individuals in this case. All the claims are rooted in in the allegedly "malicious" peer review process that revoked Dr. Mirza's Privileges. (Doc. 41 at ¶¶ 227, 237). Furthermore, the *Goodman* court found that to determine what rights of action existed under common law, the focus of its analysis was "the context out of which the claim arises," not the exact name of the tort alleged. *Id.* at 1065–66 ("It is not enough, as [plaintiff] attempts here, to append to the asserted claim a name derived from the catalogue of common law actions. Rather, the context out of which the claim arises must be examined to determine whether it supports a conclusion that it implicates a right of action recognized by the common law.").

The context for the *Goodman* court's inquiry was "that of peer review of a health care provider that determines the provider's entitlement to work in a hospital setting." *Id.* at 1066. While Plaintiffs may label their tort claims differently than the plaintiff in *Goodman*, the damages claims' context is still an alleged harm arising from the peer review process. The Court sees no reason why applying the *Goodman* court's analysis would produce a different result in this instance simply because Plaintiffs "append" a different tort to their claim than the plaintiff in *Goodman*. *See id.* "[W]ith respect to peer review in connection with admittance to a hospital staff, no common law right of action for money damages either existed or would have been recognized in Arizona before 1971." *Id.* at 1068. Because there was no such common law right of action for damages, the protections offered by A.R.S. § 36-445.02 do not violate the anti-abrogation clause. *Id.* at 1067

(emphasis added).

This position is further bolstered by the policy considerations described in *Goodman*. The aim of statutory peer review is "reducing morbidity and mortality and for the improvement of the care of patients provided in the institution." A.R.S. § 36-445.

> That these are worthy goals cannot be gainsaid. However, militating against effective peer review is the fact that it "is not only time consuming, unpaid work, it is also likely to generate bad feelings and result in unpopularity. If lawsuits by unhappy reviewees can easily follow any decision . . . then the peer review demanded by A.R.S. § 36–445 will become an empty formality, if undertaken at all."

*Goodman*, 990 P.2d at 1068 (quoting *Scappatura v. Baptist Hosp. of Phx.*, 584 P.2d 1195, 1201 (Ariz. Ct. App. 1978)). Overall, Plaintiffs fail to persuade the Court beyond a reasonable doubt that the anti-abrogation clause precludes the protections offered by A.R.S. § 36-445.02. *See Hall*, 717 P.2d at 437. Therefore, the Court continues to presume the statute's constitutionally. *See id.* Claims Two through Twelve will be dismissed as statutorily barred.

## IV. Conclusion

To the extent that the FAC has pleaded facts in the alternative, the Court denies Defendants' request to dismiss the § 504 Rehabilitation Act claim against WARMC. The Court will dismiss claims Two through Twelve as they are barred by A.R.S. § 36-445.02, and it will dismiss the Fourteenth claim, which Plaintiffs have voluntarily dismissed. Only the § 504 claim and the request for injunctive relief remain. As the claim for injunctive relief requests action by WARMC alone, (Doc. 41 at ¶ 333), the Court will dismiss all other Defendants.

Accordingly,

**IT IS HEREBY ORDERED** that Motions to Dismiss (Docs. 50; 51; 52) are **granted**. Defendant Bullhead City Hospital Corporation dba Western Arizona Regional Medical Center's Motion to Dismiss (Doc. 47) is **granted** in part and **denied** in part as set forth in this Order. The Court will dismiss all but the First and Thirteenth claims in the First Amended Complaint (Doc. 41). The Court will also dismiss all parties except for

Defendant Bullhead City Hospital Corporation dba Western Arizona Regional Medical Center.

**IT IS FURTHER ORDERED** that Defendant Bullhead City Hospital Corporation dba Western Arizona Regional Medical Center's Motion to Seal (Doc. 48) is **denied** as moot.

**IT IS FURTHER ORDERED** resetting the Rule 16 Scheduling Conference for June 1, 2021, at 10:30 a.m. The remainder of the Court's Order at Doc. 16 is otherwise **AFFIRMED**.

Dated this 26th day of April, 2021.

Honorable Diane J. Humetewa
United States District Judge